Filed 8/13/18

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| MONSTER ENERGY COMPANY, | E066267 |
| Plaintiff and Respondent, | (Super.Ct.No. RIC1511553) |
| v. | OPINION |
| BRUCE L. SCHECHTER et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County. Daniel A. Ottolia, Judge. Affirmed in part, reversed in part, and remanded with directions.

Bremer Whyte Brown & O'Meara, Keith G. Bremer, Jeremy S. Johnson, and Benjamin L. Price; Grignon Law Firm and Margaret M. Grignon for Defendants and Appellants.

Shook, Hardy & Bacon, Frank C. Rothrock, and Gabriel S. Spooner for Plaintiff and Respondent.

When a settlement agreement provides that the "[p]laintiffs and their counsel agree" to keep the terms of the agreement confidential, and when the plaintiffs' counsel

signs the agreement under the words, "Approved as to form and content," can the plaintiffs' counsel be liable to the defendant for breach of the confidentiality provision? We answer this question, "No."

I

FACTUAL BACKGROUND

A.     *The Settlement Agreement*.

Richard Fournier and Wendy Crossland (collectively the Fourniers) filed an action (the Fournier case) against Monster Energy Company (Monster) and a related defendant. The Fourniers were represented by the R. Rex Parris Law Firm (Parris) and Bruce Schechter (collectively the Attorneys).

On July 29, 2015, the Fourniers and Monster entered into an agreement to settle the Fournier case. The settlement agreement provided, among other things:

Recitals:  "This Settlement Agreement and Release ('Settlement Agreement') is entered into as of July 29, 2015, by and between Wendy Crossland and Richard Fournier . . . ('Plaintiffs'), on the one hand, . . . and Monster Energy Company [and its co-defendant] ('Defendants'), on the other hand.  Sometimes hereinafter, all of the above-named persons and entities shall be collectively referred to as the 'Parties' and/or individual settling persons and entities are referred to as a 'Party.'

"Said Settlement Agreement shall be on the behalf of the settling Parties, individually, as well as on the behalf of their, without limitation, respective beneficiaries, trustees, principals, *attorneys*, officers, directors, shareholders, employers, employees,

2

parent company(ies), affiliated company(ies), subcontractors, members, partners, subsidiaries, insurers, predecessors, successors-in-interest, and assigns.

"The settling Parties represent . . . :  [¶]  . . . That each expressly has the authority to execute this Settlement Agreement, and that this Settlement Agreement as so executed will be binding upon each of them . . . ."  (Capitalization altered, italics added.)

Paragraph D:  "[T]he Parties represent and warrant that each individual and/or Party executing this Settlement Agreement is duly authorized to execute this Settlement Agreement and expressly has the authority to execute this Settlement Agreement on behalf of all Parties and/or Insurers he/she/it represents as identified by his or her signature line, that it is binding in accordance with its terms, and that this Settlement Agreement as so executed will be binding upon him/her/it/them . . . ."

Paragraph 1.1:  " . . . Plaintiffs, individually and on behalf of themselves and their principals, beneficiaries, trustees, agents, *attorneys*, servants, representatives, parents, spouse, dependents, issue, heirs, insurers, predecessors, successors-in-interest and assigns (all of the foregoing, past, present or future) (the 'Releasing Parties') hereby completely release and forever discharge Defendants, together with their respective successors, divisions, affiliates, units, parents, subsidiaries, related companies/entities, shareholders, officers, directors, employers, employees, subcontractors, agents, insurers, *attorneys*, and representatives of all kinds (collectively 'Released Parties') from any and all claims . . . ." (Italics added.)

3

Paragraph 7.0: "[T]his Settlement Agreement . . . is the result of extensive good faith negotiations between the Parties through their respective counsel . . . ."

Paragraph 8.0: "The Parties acknowledge that this Settlement Agreement . . . is . . . wholly binding upon them, as well as inure [*sic*] to the benefit of the Released Parties, inclusive of, but not limited to, their respective successors, devisees, executors, administrators, affiliates, representatives, insurers, spouse, dependents, successors, heirs, issue, assigns, officers, directors, partners, agents, subcontractors, *attorneys*, employers, and employees." (Italics added.)

Paragraph 11.1: "The Parties understand and acknowledge that all of the terms, conditions and details of this Settlement Agreement including its existence are to remain confidential. *Plaintiffs and their counsel agree* that they will keep completely confidential all of the terms and contents of this Settlement Agreement, and the negotiations leading thereto, and will not publicize or disclose the amounts, conditions, terms, or contents of this Settlement Agreement in any manner . . . .

"Specifically, and without limitation, Plaintiffs *and their counsel of record . . .* agree and covenant, absolutely and without limitation, to not publicly disclose to any person or entity, including, but not limited to, newspapers, magazines, television, fliers, documentaries, brochures, *Lawyers & Settlements*, VerdictSearch (or the like), billboards, radio, newsletters, or the Internet . . . :

"a) The Settlement Agreement and its existence, terms, conditions, and details; . . . c) any amounts paid in settlement of this Action . . . ." (Italics added.)

Paragraph 11.2: "In regard to any communication concerning the settlement of this Action, the Parties *and their attorneys* and each of them hereby agree that neither shall make any statement about the Action . . . in the media, including but not limited to print, television, radio, or Internet." (Italics added.)

Paragraph 11.3: "Any comment made regarding the settlement of this Action shall be limited to the following, or words to their effect: 'This matter has been resolved.'"

Paragraph 11.4: "Plaintiffs, including those acting at Plaintiffs' request, shall not . . . make, express, transmit, speak, write, verbalize or otherwise communicate in any way . . . any remark, comment, message, information, declaration, communication or other statement of any kind . . . that is derogatory, defamatory, critical of, or negative toward the Defendants and/or Defendants' products . . . . Nothing herein, however, shall be construed as a limitation on, or prohibition of . . . Plaintiffs' attorneys' ability to disparage (within the confines of the law) Defendants or Defendants' products in connection with other current or future litigation against the Released Parties . . . ."

There was a signature block signed by the Fourniers and Monster. Under that were the words, "Approved as to form and content" (capitalization altered), and under that was another signature block signed by the parties' respective attorneys. Schechter signed as follows:

"R. REX PARRIS LAW FIRM

"By: [Schechter's signature] [¶] . . . [¶] . . .

5

"Attorneys for Plaintiff [*sic*] WENDY CROSSLAND and RICHARD FOURNIER . . . ."

Schechter later admitted, "I knew that Monster would not settle the case if [the Fourniers] did not agree to keeping it confidential."

B.    *The Alleged Breach of the Settlement Agreement*.

Brenda Craig was a reporter for Lawyersandsettlements.com. Lawyersandsettlements.com "provide[s] a source of information about [readers'] legal rights" and also "help[s] lawyers reach out to the clients they seek."

On September 4, 2015, Craig interviewed Schechter. She said she wanted to talk to him about cases his office was handling that involved energy drinks. In general, Schechter discussed other cases against Monster, as well as what he viewed as the negative health effects of Monster's products. In particular, he said:

1. The recent case of a 14-year-old girl — who was at a mall with friends, had two Monster energy drinks, went into cardiac failure, and died — had been resolved.

2. In response to a question about what the resolution was, "[S]ubstantial dollars for the family."

3. Monster "wants the amount to be sealed."

4. Regarding Monster's energy drinks, "It is not the individual ingredients, it is the synergistic effect of these 26 ingredients" that is "deadly."

It is undisputed that the first three of these statements refer to the Fournier case.

6

On September 15, 2015, Lawyersandsettlements.com published an online article that included all four statements listed above.

The end of the article stated: "**Monster Energy Drink Injury Legal Help** [¶] If you or a loved one have suffered losses in this case, please click the link below and your complaint will be sent to a drug and health supplements lawyer who may evaluate your Monster Energy Drink Injury claim at no cost or obligation."

Lawyersandsettlements.com sent the leads that it generated to attorneys who had signed up to be "advertisers." It had "forwarded hundreds of thousands of requests for legal representation directly to lawyers." One employee of Lawyersandsettlements.com was also a non-lawyer employee of Parris.

II

PROCEDURAL BACKGROUND

Monster filed this action against the Attorneys, asserting causes of action for: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) unjust enrichment, and (4) promissory estoppel.

The Attorneys filed a special motion to strike under Code of Civil Procedure section 425.16 (SLAPP motion). They argued, among other things, that Monster could not show a probability of prevailing on its breach of contract claim because they were not parties to the settlement agreement.

7

In opposition, Monster argued, among other things: (1) Schechter's statements were commercial speech and therefore unprotected, and (2) the Attorneys were "[c]learly" bound by the settlement agreement.

The trial court denied the motion with respect to the breach of contact cause of action but granted it with respect to the other causes of action. It explained, in part: "[T]he settlement clearly contemplates counsel as being subject to the agreement because . . . plaintiffs had the authority to execute the settlement agreement on behalf of their counsel, and counsel is clearly allowed and not allowed to do certain things in the settlement. [¶] In addition, counsel signed the document." It added that Schechter's "suggestion that he is not a party to the contract merely because he approved it as to form and content only is beyond reason."

## III

## MONSTER FAILED TO SHOW A PROBABILITY OF PREVAILING

A. *General Principles Applicable to a SLAPP Motion.*

"Under California's anti-SLAPP statute, a defendant may bring a special motion to strike a cause of action arising from constitutionally protected speech or petitioning activity. (Code Civ. Proc., § 425.16, subd. (b)(1).)" (*Barry v. State Bar of California* (2017) 2 Cal.5th 318, 320.)

"The analysis of an anti-SLAPP motion . . . involves two steps. 'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one "arising from" protected activity. [Citation.] If the court finds such a

showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim.' [Citation.] 'Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute — i.e., that arises from protected speech or petitioning *and* lacks even minimal merit — is a SLAPP, subject to being stricken under the statute.' [Citation.] We review an order granting or denying a motion to strike under [Code of Civil Procedure] section 425.16 de novo. [Citation.]" (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 819-820.)

"To show a probability of prevailing on his claims, '"the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.] . . . [T]hough the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim."'' [Citation.]" (*Daniel v. Wayans* (2017) 8 Cal.App.5th 367, 388.)

B. *Monster Failed to Show that Schechter's Comments Were Within the Commercial Speech Exemption.*

The trial court ruled that Schechter's statements were "in furtherance of the . . . right of . . . free speech" within the meaning of Code of Civil Procedure section 425.16. Schechter contends that this ruling was correct. Monster does not dispute that the statements, if made by a different lawyer to a different reporter, could be protected

9

speech. It does argue, however, that under the circumstances here, the statements were "commercial speech" and therefore not protected.

Under prevailing United States Supreme Court authority, commercial speech that concerns lawful activity and that is not misleading is protected by the First Amendment, even though it is subject to an intermediate level of scrutiny rather than strict scrutiny. (*Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York* (1980) 447 U.S. 557, 566.) Thus, even assuming Schechter's speech was commercial, it could still be in furtherance of his right to freedom of speech. (*Dean v. Friends of Pine Meadow* (2018) 21 Cal.App.5th 91, 106.)

There is, however, a statute expressly exempting commercial speech from SLAPP procedures. As relevant here, it provides:

"[Code of Civil Procedure s]ection 425.16 does not apply to any cause of action brought against a person primarily engaged in the business of selling . . . goods or services, . . . arising from any statement or conduct by that person if both of the following conditions exist:

"(1) The statement or conduct consists of representations of fact about that person's . . . business operations, goods, or services, that is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services . . . .

10

"(2)  The intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer . . . ."  (Code Civ. Proc., § 425.17(c).)

"The commercial speech exemption . . . 'is a statutory exception to section 425.16' and 'should be narrowly construed.'  [Citations.]"  (*Simpson Strong-Tie Company, Inc. v. Gore* (2010) 49 Cal.4th 12, 22.)  "The burden of proof as to the applicability of the commercial speech exemption . . . falls on the party seeking the benefit of it — i.e., the plaintiff."  (*Id*. at p. 26.)

As already mentioned, we ordinarily review the grant or denial of a SLAPP motion independently.  However, the typical two-prong SLAPP analysis presents purely legal issues.  "[T]he analysis of the first prong focuses on the allegations of the complaint."  (*Ralphs Grocery Co. v. Victory Consultants, Inc.* (2017) 17 Cal.App.5th 245, 256.)  And the analysis of the second prong is a summary-judgment-like standard that does not involve any credibility determinations.  (*Id*. at p.  261.)

By contrast, the determination of whether the commercial speech exemption applies turns, in part, on the defendant's "purpose" and "inten[t]."  (Code Civ. Proc., § 425.17, subds. (c)(1), (c)(2).)  "[Q]uestions of 'intent' and 'purpose' are ordinarily questions of fact to be determined by the trial court."  (*Redke v. Silvertrust* (1971) 6 Cal.3d 94, 103.)

Particularly when the First Amendment is involved, "'[i]ndependent review is not the equivalent of de novo review "in which a reviewing court makes an original appraisal

11

of all the evidence to decide whether or not it believes" the outcome should have been different. [Citation.] Because the trier of fact is in a superior position to observe the demeanor of witnesses, credibility determinations are not subject to independent review . . . . [Citations.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 36.) Thus, we accept the trial court's credibility determinations, even though we review the legal effect of those determinations independently.

"[A] lawyer may be said to be 'primarily engaged in the business of selling or leasing goods or services' [citation], because providing legal advice and representation is a service." (*Taheri Law Group v. Evans* (2008) 160 Cal.App.4th 482, 490.)

Here, however, the trial court found insufficient evidence that the Attorneys were "advertising" because there was no evidence that they received any of the leads that the article generated. Arguably, one could infer that Parris did receive leads from the fact that a Parris employee also worked for Lawyersandsettlements.com;[1] or one could infer that Schechter expected at least some people who read the article to contact Parris directly, without going through Lawyersandsettlements.com. At the same time, however, Monster did not conclusively prove that Parris did, in fact, receive leads. Thus, this is a credibility issue, and the trial court resolved it in favor of finding no intent to solicit.

---

[1] Of course, one could equally infer the opposite — that due to this personal connection, Schechter was willing to give Lawyersandsettlements.com material for an article without expecting anything in return.

12

"When the trier of fact has expressly or implicitly concluded that the party with the burden of proof failed to carry that burden and that party appeals, the substantial evidence test does not apply. Instead, 'the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.' [Citation.] "'Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citations.]"' [Citation.]" (*Petitpas v. Ford Motor Company* (2017) 13 Cal.App.5th 261, 302-303.) On this record, the trial court's finding that Monster's evidence was insufficient to prove commercial purpose and intent was perfectly reasonable.

C.      *The Attorneys Did Not Consent to Be Bound by the Settlement Agreement*.

The Attorneys contend that Monster failed to show a probability of prevailing on its cause of action for breach of contract because they were not parties to the settlement agreement. In our view, this issue breaks down into two subissues:

1. Whether the Fourniers could bind the Attorneys to the settlement agreement without the Attorneys' consent; and

2. Whether the Attorneys consented to be bound by the settlement agreement by signing it.

"An essential element of any contract is the mutual consent of the parties. [Citation.]" (*Harshad & Nasir Corporation v. Global Sign Systems, Inc.* (2017) 14 Cal.App.5th 523, 537.) "Further, the consent of the parties to a contract must be

13

communicated by each party to the other. [Citation.]" (*Esparza v. Sand & Sea, Inc.* (2016) 2 Cal.App.5th 781, 788.)

Monster focuses on the provisions of the contract. We agree that the confidentiality provisions of the settlement agreement did at least purport to bind the Attorneys. They provided, "Plaintiffs and their counsel agree that they will keep completely confidential all of the terms and contents of this Settlement Agreement . . . ." They also provided, "Plaintiffs and their counsel of record . . . agree and covenant, absolutely and without limitation, to not publicly disclose" the provisions of the settlement agreement. Finally, they provided, "the Parties and their attorneys . . . hereby agree that neither shall make any statement about the Action . . . in the media . . . ."

However, the immediate issue is not one of contractual interpretation. "[A] party cannot bind another to a contract simply by so reciting in a piece of paper. It is rudimentary contract law that the party to be bound must first *accept* the obligation." (*Mitsui O.S.K. Lines, Ltd. v. Dynasea Corp.* (1999) 72 Cal.App.4th 208, 212; see also *Carter v. City of Los Angeles* (2014) 224 Cal.App.4th 808, 822-823.) No matter how plainly the contract provided that the Attorneys were bound, they could not actually be bound unless they manifested their consent.

There are a handful of exceptions to these general rules. An agent can, under appropriate circumstances, enter into a contract that is binding on the principal. (Civ. Code, § 2337.) And an attorney is, at least in some respects, the agent of the client (*Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone* (2003) 107

14

Cal.App.4th 54, 69), even though in other respects, the attorney is an independent contractor (*Channel Lumber Co., Inc. v. Porter Simon* (2000) 78 Cal.App.4th 1222, 1227-1232).  Hence, there are instances in which an attorney can bind his or her client to a contract.  (*Blanton v. Womancare, Inc.* (1985) 38 Cal.3d 396, 403-404.)  However, this does not work in reverse — the client cannot bind the attorney.

The trial court relied on the provisions in which "the Parties" represent and warrant that they have the authority to execute the settlement agreement.  "The Parties," however, were defined as the parties to the Fournier case.  Only Paragraph D extended this representation by "the Parties" to other persons or entities; in it, each of "the Parties" represented that he, she, or it had "the authority to execute this Settlement Agreement on behalf of all Parties and/or Insurers he/she/it represents as identified by his or her signature line . . . ."  The Attorneys were not "Parties" or "Insurers" and were not identified in the Fourniers' signature line.

Even if the Fourniers did expressly represent that they had the authority to execute the settlement agreement on behalf of the Attorneys, that would not be binding on the Attorneys.  It is hornbook law that "[t]he declarations of an [alleged] agent are not admissible to prove the fact of his agency or the extent of his power as such agent. [Citations.]"  (*Howell v. Courtesy Chevrolet, Inc.* (1971) 16 Cal.App.3d 391, 401.)

For the sake of completeness, we note that, in the somewhat recondite context of arbitration agreements, "[t]here are cases in which an employee is held to be bound by an arbitration agreement entered into by his or her employer, even though the employee did

15

not sign on to the agreement." (*Jensen v. U-Haul Co. of California* (2017) 18 Cal.App.5th 295, 302, fn. omitted.) However, "the mere fact that parties are employees of a corporation 'does not mean they were bound' by an arbitration clause in an agreement between the corporation and a third party. [Citation.]" (*Id*. at p. 303.) Rather, "the proper inquiry is not only whether there is any sort of preexisting agency relationship with one of the signatories to the arbitration agreement — whether employer-employee, or another form of agency — but also whether that preexisting relationship is of such a nature that it supports a finding of 'implied authority for [one of the signatories] to bind [the nonsignatory] by their arbitration agreement.' [Citation.]" (*Ibid*.) Even assuming these cases are not limited to the arbitration context, here there is no evidence of such implied authority so as to take this case outside the general rule that the principal cannot contractually bind the agent.

Accordingly, the provisions in the settlement agreement stating that the Fourniers' attorneys agree to keep the settlement agreement confidential, if valid at all, mean that *the Fourniers* agree to *direct* their attorneys to keep the settlement agreement confidential. If their attorneys fail to do so, however, Monster's only claim for breach of the settlement agreement is against the Fourniers. (We need not decide whether the Fourniers would have some claim against their attorneys.)[2]

---

[2]     Consistent with this view, Schechter testified that, while he had no contractual duty to Monster, he did have a duty to his clients "not to cause or create any potential litigation for them."

We turn, then, to whether it makes any difference that the Attorneys did actually sign the settlement agreement. It is possible to sign a contract without becoming a party to the contract. For example, a person who signs a contract as the agent for a disclosed principal is not a party. (E.g., *Carlesimo v. Schwebel* (1948) 87 Cal.App.2d 482, 486-488.)

Here, the settlement agreement identified the "Parties" as the Fourniers and Monster. The Attorneys then signed under the words, "Approved as to form and content." Moreover, the signature block identified them as "Attorneys for [the Fournier] Plaintiff[s]." The only reasonable construction of this wording is that they were signing solely in the capacity of attorneys who had reviewed the settlement agreement and had given their clients their professional approval to sign it. In our experience, this is the wording that the legal community customarily uses for this purpose.

*Freedman v. Brutzkus* (2010) 182 Cal.App.4th 1065, though not on point, is the only relevant California case we have found. There, two corporations, Teddi and CAI, entered into a trademark licensing agreement. Freedman, who was Teddi's attorney, and Brutzkus, who was CAI's attorney, both signed the agreement under the words, "Approved as to Form and Content." (*Id*. at p. 1068.) Freedman had previously represented CAI, but the agreement provided that CAI waived any resulting conflict of interest. (*Ibid*.)

CAI sued Teddi, which went into bankruptcy. CAI then sued Freedman; it alleged that, during the contract negotiations, he had represented to CAI that Teddi would pay the

17

amount due under the agreement.  In discovery, Brutzkus confirmed that CAI had relied on this representation due to its long-standing professional relationship with Freedman. (*Freedman v. Brutzkus*, *supra*, 182 Cal.App.4th at p. 1068.)

Freedman settled with CAI, then sued Brutzkus.  (*Freedman v. Brutzkus*, *supra*, 182 Cal.App.4th at p. 1068.)  He alleged that, by signing the agreement under "Approved as to Form and Content," Brutzkus had falsely represented that CAI was not relying on its relationship with Freedman or any representations by him.  (*Id*. at pp. 1068-1069.)

The appellate court held that "Brutzkus's signature approving the document as to form and content was not an actionable representation to [Freedman].  [Citation.]" (*Freedman v. Brutzkus*, *supra*, 182 Cal.App.4th at p. 1070.)  It conceded, "We find little authority in California or elsewhere addressing the meaning of this recital.  [Citations.]" (*Ibid*.)  However, it concluded that "the only reasonable meaning to be given to a recital that counsel approves the agreement as to form and content, is that the attorney, in so stating, asserts that he or she is the attorney for his or her particular party, and that the document is in the proper form and embodies the deal that was made between the parties." (*Ibid*.)

The Attorneys argue — correctly — that *Freedman*'s construction of the words "approved as to form and content" is inconsistent with a conclusion that an attorney signing under  such words is agreeing to be bound.  However, Monster argues — also correctly — that *Freedman* is arguably distinguishable because "there is no indication the trademark license agreement at issue in *Freedman* contained any provisions that were

18

expressly binding on or benefitted the attorneys." The trial court further distinguished *Freedman* "because the issue is not a fraud claim, but whether counsel is a party to the agreement, which *Freedman* did not address."

There is an out-of-state case, however, which applied *Freedman* in a situation almost exactly like ours.

In *RSUI Indem. Co. v. Bacon* (2011) 282 Neb. 436 [810 N.W.2d 666], a general contractor entered into a settlement agreement with Bacon, the injured employee of a subcontractor, Ridgetop. (*Id*. at p. 438.) The settlement agreement provided that, in the event that Bacon entered into a settlement with Ridgetop, "Bacon and his attorneys" would pay the general contractor's insurer a specified portion of that settlement. (*Id*. at pp. 437-438, capitalization altered.) Harris, Bacon's attorney, signed the settlement agreement under the words, "Agreed to in Form & Substance." (*Id*. at p. 438.) Later, Bacon received a $1.25 million settlement from Ridgetop. (*Id*. at p. 439) Liberty Mutual, the general contractor's insurer, then sued Bacon, Harris, and Harris's law firm for breach of contract; it obtained a judgment against them for $437,500. (*Id*. at p. 439.)

The appellate court reversed the judgment against Harris and his firm; it held that they were not personally liable. (*RSUI Indem. Co. v. Bacon*, *supra*, 282 Neb. at pp. 440-444.) Citing *Freedman*, it said: "Harris' signature under the legend 'Agreed to in Form & Substance' demonstrates only that he was Bacon's attorney and that 'the document [was] in the proper form and embodie[d] the deal that was made between the parties.'" (*RSUI Indem. Co. v. Bacon, supra,* at p. 442.)

19

We agree with *RSUI*. As already discussed, the language in the settlement agreement purporting to impose obligations on the Attorneys was a nullity, unless and until the Attorneys consented to it. And while *Freedman* is not precisely on point, it does stand for the proposition that an attorney's signature under words such as "approved as to form and content" means only that the document has the attorney's professional thumbs-up. It follows that it does not objectively manifest the attorney's intent to be bound.

Monster points to the fact that, in the settlement agreement, it released its claims against the Fourniers' attorneys, and vice versa. However, the mutual release of claims provisions included the broadest list of released and releasing entities imaginable. There was a signature block for the Attorneys, but not for these other entities. This confirms that the Attorneys signed in their capacity as attorneys, and not as released or releasing parties.

We recognize that confidentiality is often a material term of a settlement agreement. If a party is willing to keep the settlement agreement confidential, but that party's attorney is free to blab about it, the other party may not be willing to settle at all. Thus, it would be contrary to the public policy favoring settlement (see generally *Leung v. Verdugo Hills Hospital* (2012) 55 Cal.4th 291, 304) to hold that there is no way to require the attorneys for the parties to keep a settlement agreement confidential.[3] It

---

[3]    While nondisclosure agreements have come under fire recently (see End of the Nondisclosure Agreement? Not So Fast, Wall Street Journal (Mar. 26, 2018), available at <https://www.wsj.com/articles/end-of-the-nondisclosure-agreement-not-so-fast-1522056601>, as of Aug. 9, 2018), so far the California Legislature has not taken any action to redefine existing public policy by limiting or prohibiting them.

20

seems easy enough, however, to draft a settlement agreement that explicitly makes the attorneys parties (even if only to the confidentiality provision) and explicitly requires them to sign as such.

Even regarding settlement agreements that lack such explicit provisions, such as the one in this case, our holding does not necessarily mean that a party in Monster's position has no remedy. At the risk of indulging in dictum, we have already suggested that Monster may have a cause of action against the Fourniers. We also note that the sole cause of action that Monster has stated against the Attorneys for breach of contract is on the settlement agreement. Arguably, however, it could state a cause of action as a third-party beneficiary of the attorney-client contract between the Fourniers and the Attorneys. (See, e.g., *Paul v. Patton* (2015) 235 Cal.App.4th 1088; *Biakanja v. Irving* (1958) 49 Cal.2d 647.) In any event, an attorney who discloses confidential settlement provisions faces practical and ethical risks (see fn. 2, *ante*), even aside from the possibility of getting sued by the party on the other side, so we would expect the issue to arise only rarely.

In sum, then, we conclude that the Attorneys were not parties to the settlement agreement, including its confidentiality provisions. Accordingly, Monster could not show that it had a probability of prevailing against the Attorneys on its cause of action for breach of contract.

IV

DISPOSITION

The order appealed from, to the extent that it denied the SLAPP motion with respect to the first cause of action, is reversed; in all other respects, the order is affirmed. We direct the trial court, on remand, to enter an order granting the SLAPP motion in its entirety and granting the Attorneys their attorney fees and costs. (Code Civ. Proc., § 425.16, subd. (c)(1).) The Attorneys are awarded costs on appeal, likewise including attorney fees, against Monster.

CERTIFIED FOR PUBLICATION

RAMIREZ
P. J.


We concur:

McKINSTER
J.

MILLER
J.

22