Filed 9/17/15 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| CHRISTINE DIAMOND et al.,<br><br>        Plaintiffs and Respondents,<br><br>v.<br><br>SERGE RESHKO et al.,<br><br>        Defendants and Appellants. | A139251<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-11-511948)<br>ORDER MODIFYING OPINION<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on August 20, 2015, be modified as follows:

On page 20, line 2 of the first sentence in the third full paragraph, beginning "In the present case," the word "not" is to be inserted between the words "does" and "convey" so that the sentence reads:

In the present case, although the trial court refused to inform the jury about the settlement agreement at least three times, the record does not convey precisely why the court made these rulings.

There is no change in the judgment.

DATED: _____        _____

                                                                  RUVOLO, P. J.

Filed 8/20/15 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CHRISTINE DIAMOND et al.,<br><br>    Plaintiffs and Respondents,<br><br>v.<br><br>SERGE RESHKO et al.,<br><br>    Defendants and Appellants. | A139251<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-11-511948) |

## I.

## INTRODUCTION

Christine Diamond was injured while riding as a passenger in a taxi that was involved in a collision with another car. Diamond and her husband Andrew (the Diamonds) brought a negligence action against the drivers and owners of each vehicle. The Diamonds settled their claims against the taxi driver, Amir Mansouri, the owner of the cab, Antonin Mastalir, and the Yellow Cab Collective (referred to collectively in the singular as Yellow Cab). Pursuant to a provision in that settlement, Yellow Cab agreed to appear and participate as a party defendant at the Diamonds' jury trial. At the conclusion of the evidence the jury found both drivers were negligent and attributed 60 percent responsibility to the driver of the other car, Serge Reshko, and his mother Valentina Reshko (the Reshkos). The trial court entered a judgment on the jury verdict holding the Reshkos liable to the Diamonds for $406,698.00, plus fees and costs.

On appeal, the Reshkos contend the trial court committed structural error by excluding evidence of the pretrial settlement between the Diamonds and Yellow Cab. We hold that, while not structural error, the trial court abused its discretion by excluding

1

this relevant evidence and, under the circumstances, the error was prejudicial. Therefore, the judgment must be reversed.

## II.

## STATEMENT OF FACTS

### A. Background

The accident that gave rise to this litigation occurred shortly before 7:00 p.m. on January 4, 2011, at the intersection of California and Cherry Streets in San Francisco. That segment of California Street consists of four driving lanes, two facing east and two west, with outside parking lanes on each side. The intersection at California and Cherry is controlled by traffic lights.

San Francisco Police Officer Mark Lantrip investigated the accident and prepared a police report. When he arrived at the scene, two vehicles were in the middle of the intersection, a Yellow Cab taxi that had been broadsided and a Chevrolet Caprice with front-end damage. The occupants of both vehicles had been transported to San Francisco General Hospital, where Lantrip went to interview them.

Christine Diamond, a passenger in the cab, made the following statement: "I remember being in the cab and it was making a U-turn. A motorcycle went by and the cab driver hits his brakes. After that, the cab driver proceeded to make a U-turn and I don't remember anything after that." Amir Mansouri, the cab driver, told Lantrip that he picked up his fare on California Street in front of California Pacific Medical Center (CPMC), and then waited at the intersection with Cherry Street for the light regulating the cars on California Street to turn yellow. Then, Mansouri reported, "I got situated to make a U-turn. I started into the intersection to make a U-turn and the light turned red. As I was making the U-turn, I was making the U-turn [*sic*] and the car hit me."

Serge Reshko, the driver of the other car, left the hospital before Lantrip arrived, so Lantrip contacted him by telephone the day after the accident. Reshko said he was traveling in the inside (left) lane on California Street, heading toward Cherry Street. As he approached the light, Reshko reported, "I saw the cab starting to make a U-turn in

2

front of me. I hit my brakes and skidded into the cab. I was going about 35 miles per hour."

Lantrip also made telephone contact with an eyewitness to the accident, Joe Sweeney. Sweeney gave the following statement: "I was the first car at the light on Cherry street facing south. . . . I saw the cab in the far right lane [on California Street] beginning to make a U-turn. Cab was halfway into the turn and the Chevy broadsided it. I spoke to the driver of the Chevy and he said to me 'That was a stupid thing he did, making the turn like that' and I told him, 'Well, you were speeding.' And he replied, 'I was trying to make the light.' "

Lantrip issued a citation to Mansouri for making an improper U-turn from an outside lane and also cited Reshko for speeding. As part of his investigation, Lantrip made a determination that the improper U-turn was the primary collision factor in the accident, and the other vehicle that was traveling too fast for conditions was an associated factor. Lantrip concluded that the speed of the approaching vehicle was not the primary factor because "[i]f the U-turn wasn't made, the speeding vehicle probably would have made it through the intersection without striking another vehicle. [¶] And our opinion as traffic accident investigators, the cab driver should have gone around the block instead of trying to make an illegal U-turn in the middle of an intersection with other vehicles present."

**B. The Lawsuit**

In June 2011, the Diamonds filed this negligence action against Yellow Cab and the Reshkos. A jury trial was scheduled to begin on September 24, 2012. In their September 2012 mediation brief, the Diamonds took the position that the extensive discovery conducted by the parties established that the clear negligence of both drivers caused Christine Diamond extensive injuries, and that insurance companies for both sets of defendants had committed bad faith by rejecting the Diamonds' demands to pay their respective policy limits.

When the case was called for trial on September 24, 2012, Yellow Cab disclosed to the Reshkos and the trial court that it had reached a settlement with the Diamonds.

The trial was continued, and, a few days later, Yellow Cab filed a motion under section 877.6 of the Code of Civil Procedure for a determination that the settlement with the Diamonds was reached in good faith. Yellow Cab disclosed the material terms of the agreement including that: (1) the three Yellow Cab defendants would jointly tender $350,000.00 to Christine Diamond and $50,000.00 to Andrew Diamond; (2) the attorney who represented Yellow Cab "agreed to remain an active participant" at the Diamonds' jury trial; and (3) the Diamonds agreed to provide a covenant not to execute and a release of all claims against Yellow Cab.

At a hearing on the motion for a good faith determination, the Reshkos argued that that they did not oppose a good faith finding provided that there was a "recognition at trial that there's been a settlement." Ultimately, the court made a good faith determination without deciding whether evidence of the Diamond/Yellow Cab settlement was admissible at trial. The court reasoned that ruling on the admissibility of evidence was a trial court function, and it was "not going to tell the trial judge what to do." A formal order determining good faith settlement was entered on December 7, 2012.

In March 2013, the Diamonds' jury trial began with preliminary matters, including a motion in limine by the Reshkos for an order that the jury be informed about the Diamonds' settlement with Yellow Cab. They argued the settlement was admissible to show bias or prejudice arising out of the fact that Yellow Cab and the Diamonds now were allied against the Reshkos. The Diamonds opposed the motion, arguing that witness bias generally would not be an issue, but conceded that it would be if the cab driver's trial testimony about the accident conflicted with deposition testimony he gave before the settlement was reached. Yellow Cab joined the Diamonds in opposing the motion, arguing its trial counsel had a legal right to participate fully at trial. Yellow Cab's trial attorney assured the court that he was "not going to be going overboard," other than on the issue of liability, claiming that his client had always felt the accident was not its fault. The Reshkos countered that the settlement affected the trial as to damages, not just liability. They argued the settlement freed Yellow Cab from having to dispute causation and damages, and would allow it to force the Reshkos into a "bad guy" role while Yellow

4

Cab curried favor with the jury. This distorted role gave the Diamonds and Yellow Cab traction for a joint theory that the Reshkos were primarily liable for the accident.

The trial court decided to reserve ruling on the Reshkos' motion, explaining: "We're making projections about how things will play out and we are making projections about how they will appear to the jury and I think it's more appropriate to see how things actually unfold."

## C. Trial Evidence Regarding Liability

In addition to testimony about the police investigation of the accident, the jury heard from four primary percipient witnesses. Christine Diamond testified that shortly before the accident occurred, she hailed a cab at the curb on California Street outside CPMC, where she had been visiting her six-week-old son, who had been born prematurely, and who was in the hospital's Newborn Intensive Care Unit (NICU). She got into the rear passenger seat of the cab, which was facing west, and asked the driver to take her to her home in North Beach, which was east of the hospital. Christine could not remember if she put on her seatbelt, but testified that it was her habit to wear one. The next thing she remembered was waking up in an ambulance.

Amir Mansouri testified that after Christine told him where she wanted to go, he decided to make a U-turn at the intersection of California and Cherry. While still stopped at the curb on California Street in front of CPMC, he checked his mirrors to make sure the road was clear and, at that point, he saw a Caprice approaching from "far away." Looking forward, Mansouri could see that the light at the intersection with Cherry was green, so he activated his signal and drove toward the intersection. He moved the cab completely into the outside driving lane, and when he reached the intersection the light turned yellow. He then pulled into the intersection and "situated" himself to make a U-turn by "straddling" both driving lanes and coming to a complete stop to wait for the light to turn red. When the light turned red and the eastbound California Street traffic stopped, Mansouri started to make his U-turn. He saw the Caprice approaching in the inside westbound lane on California Street, but he fully expected it to stop at the light. Instead, the other driver ran the light and broadsided his cab.

5

Mansouri testified that he clearly remembered that when he looked in his rearview mirror before he pulled away from the curb Christine was wearing her seatbelt.[1] When faced with prior deposition testimony that he did not remember if Christine put on her seat belt, Mansouri reiterated that he did remember seeing her wear the seat belt, but also acknowledged he could not be 100 percent sure. Under cross-examination, Mansouri also admitted that he made the U-turn from the outside, right-hand lane, but he insisted that his turn was not illegal. Mansouri told the jury he went to court to fight his citation and "won," but he could not recall why the ticket was dismissed. When asked whether he accepted any responsibility for the accident that occurred, Mansouri answered "No."

Serge Reshko testified that he was driving westbound on the inside lane of California Street along with the speed of traffic as he approached the intersection at Cherry Street.[2] The light was yellow, so he accelerated to about 35 or 40 miles per hour in order to cross the intersection before the light turned red. To his right, Reshko noticed Mansouri's cab, moving alongside the curb in the parking lane at around five miles per hour with its left turn signal on, and he assumed that it was going to pull into the outside driving lane next him. Instead, the cab driver looped or arced the cab all the way into the intersection and, without ever stopping, proceeded to make a U-turn directly in front of where Reshko was attempting to beat the yellow light. Reshko applied his brake, but hit the cab at almost a perpendicular angle. Reshko admitted that he was speeding, apologized for his actions, and accepted responsibility for his part in the accident.

Joe Sweeney testified that he was in his car at the intersection of Cherry and California when the accident occurred. His car was on Cherry Street facing south stopped at a red light, but he was looking to his left in anticipation of making a turn onto

---

[1] Mansouri testified: "You know, she tell me where to go and it was—at the same time I was doing my way bill, looking in the mirror and she told me where she is going and I remember highly that she had the seat belt on, yeah."

[2] Reshko was 19 years old and had been driving for less than a year when the accident occurred. These and other facts were used to support the Diamonds' claim against Valentina Reshko for negligent entrustment. The jury rejected that claim and it is not an issue on appeal.

California Street. He noticed the cab at the curb in front of CPMC. He also saw when the cab driver "pulled out and started doing sort of a slow U-turn," and then an "older car came just screaming into the intersection and T-boned" the taxi. Sweeney could not see the signals controlling the traffic on California Street, but he testified that he believed Reshko ran a red light because his own light was red when the cab started his turn and it was green at the time of impact. Sweeney also opined that Reshko was driving at a "rate of speed that makes you scared," probably 45 to 50 miles per hour. From Sweeney's perspective, the cab driver made a "really stupid move," but he was moving slowly, unlike the other driver who was speeding.

Sweeney testified that he pulled over after the accident to see if he could help and found himself talking with Reshko. According to Sweeney, Reshko essentially admitted that he ran a red light because he was late for a date. Sweeney testified that Reshko was "blithely unaware of what he had done." The Reshkos' trial counsel asked why Sweeney did not tell Officer Lantrip that Reshko admitted running a red light. Sweeney replied that the police report was true as far as it went, but the officer was busy dealing with too many issues and his report was not complete.

The parties presented conflicting testimony regarding the primary cause of the accident. Jon Landerville, Yellow Cab's accident reconstruction expert, was called as a witness by Yellow Cab during the Diamonds' case-in-chief.[3] Landerville's opinions included the following: (1) Reshko was speeding at a rate of 50 to 55 miles per hour; (2) When Mansouri made the decision to do a U-turn, Reshko was two blocks behind him, too far back for Mansouri to judge Reshko's speed, which is why Mansouri did not perceive him as a threat; and (3) If Reshko had not been speeding, the accident would not have happened. Landerville also testified that the use of a seatbelt would not have affected the nature or severity of Christine's injuries and, in any event, there were indications that she probably was wearing it when the collision occurred.

---

[3] The record provides no explanation as to how it came to be that Yellow Cab's liability expert witness was allowed to be called as a witness out of order and during the Diamonds' case.

Brian Doherty, the Reshkos' accident reconstruction expert, testified during their case-in-chief to the following opinions: (1) Reshko was driving at approximately 45 miles per hour when he started to apply his brakes but was unable to stop before striking the left side of the taxi; (2) the primary cause of the accident was the illegal U-turn of the cab, which was made from the right lane of California Street; (3) Christine suffered a "far side lateral impact," meaning that the cab was struck on the opposite side of the vehicle from where she was sitting; and (4) the far side impact combined with the fact that Christine was not wearing a seat belt caused her to be thrown across the interior of the cab, which would not have happened if she had been wearing a seat belt. According to Doherty, Mansouri was the primary cause of the accident because he crossed two lanes of traffic to make an illegal U-turn and failed to check for traffic immediately before making the turn. Doherty also testified that the evidence regarding the location and nature of Christine's injuries supported his conclusion that she was not wearing her seatbelt.

### D. Christine Diamond's Injuries

Christine testified that her first clear memory after getting into the taxi was of being in the ambulance, strapped on her back and feeling very disoriented. She felt "a lot of pain" between her shoulder blades and spine. When she arrived at the hospital, emergency room staff gave her pain medication and took X-rays and a CT scan, which showed that Christine suffered a "left T1 transverse process rib fracture." She had cuts and bruises, and a piece of glass had to be removed from her leg. At the emergency room, Andrew Diamond took photographs of his wife's injuries that were later admitted into evidence at the jury trial.

The emergency room doctor offered to admit Christine, but she elected to go home because her breasts were very engorged and painful from the milk she had been unable to pump, and even if she had stayed in the hospital, the only treatment recommendation was rest and pain medication. During the following week, Christine was confined to her bed, unable to visit with her infant son, and spent most of the time lying on her back because it was too painful to sit up. She testified that the pain in her back and thoracic area was so bad that it interfered with her sleep even though she was taking oxycodone and Percocet.

8

She also suffered from headaches, light sensitivity and dizziness. However, Christine testified that the accident did not cause her to experience any neck pain.[4]

On January 12, 2011, Christine sought treatment from Dr. Kenneth Light, an orthopedic surgeon. Light concluded that in addition to the traverse process and rib fracture, Christine also had a compression of the T3 vertebrae. His initial diagnosis was that the injuries would heal with time and physical therapy and, in the meantime, Christine's pain could be controlled with medication.

On January 24, 2011, Christine sought treatment from Dr. Dean Chou, a neurosurgeon and professor of neurosurgery at the University of California San Francisco (UCSF) Spine Center. During that visit, Christine reported minimal neck pain but continuous upper back pain which she described at the time as "six out of ten sharp, aching, and exhausting discomfort." During a physical exam, Christine exhibited a limited range of motion with regard to the movement of her head, and tender shoulder muscles. The left rib fracture evident on the emergency room X-rays was indicative of a forceful impact. Dr. Chou concluded Christine's injuries would heal with time and, in the meantime, he prescribed home child care for her infant son, who had been released from the NICU.

Dr. Light and Dr. Chou continued to monitor Christine's progress, but her back pain persisted. At trial, both doctors opined that Christine had a secondary condition associated with the accident. Dr. Light diagnosed Christine with posttraumatic arthritis, an inflammatory condition caused by physical stress to the joint of the spine. Light testified that this type of joint damage is permanent, often causes chronic pain, and that the symptoms gradually worsen with age. Dr. Chou testified that Christine most likely has a "myofascial injury" secondary to the accident. This condition occurs when the muscles, nerves and "fascia" area have been so stretched and inflamed that, although the "actual trauma is no longer happening, . . . the patient still has severe, severe pain from

---

[4] In years prior to the accident, Christine had suffered from neck pain and sought treatment from a chiropractor.

9

this inflammatory process." Chou opined that because Christine's myofascial injury had persisted beyond two years it was probably chronic.

The Diamonds also elicited testimony from Christine's psychiatrist, Dr. Marc Jacobs. Jacobs testified that Christine first came to see him in April 2011, and that she should have come to him earlier but it was too painful for her to get around. Jacobs diagnosed Christine with "Post-Traumatic Stress Disorder "(PTSD) caused by two closely timed traumatic events, the premature birth of her son and the automobile accident; these two events reinforced each other, causing a tremendous amount of anxiety. Dr. Jacobs testified that Christine was still suffering from PTSD at the time of trial, although she had been doing better. He also anticipated she would require future treatment because she was pregnant again, and the trial was causing her to relive the accident.

The Diamonds' expert economist testified that Christine's lost income, which included some projected future loss, was $184,302.22. After the accident, Christine had six weeks of maternity leave from her job at a financial services company where she helped clients administer their employee benefit plans. However, she did not feel well enough to work until August 2011. Initially, she assumed a 20 percent part-time schedule, and subsequently increased her hours over time, finally returning to a full-time schedule in September 2012.

The Reshkos presented expert medical testimony from two doctors. Dr. Jeffrey Meter, an orthopedic surgeon, reviewed Christine's medical records and examined her in March 2012. At trial, Dr. Meter agreed with the preliminary diagnosis of both Dr. Light and Dr. Chou that the type of injuries that Christine suffered during the accident should have healed with time. However, Dr. Meter opined that the rib and spine fractures did actually heal without causing permanent damage. He diagnosed Christine with preexisting thoracic degenerative disc disease and preexisting cervical degenerative disc disease. Meter testified that his diagnosis was consistent with Christine's X-rays and imaging exams, which showed that at the time the accident occurred Christine already had "fairly significant arthritis in her neck and in her upper back . . . for somebody of her

10

age." These conditions were also consistent with Christine's report that prior to the accident she had sought treatment with a chiropractor in 2003 and in 2010. Meter attributed Christine's ongoing pain to the degenerative changes caused by her preexisting arthritis along with being a new mother and having to lift and carry her baby.

The second expert, Dr. Mark Strassberg, is a neurologist and psychiatrist who conducted a psychiatric examination of Christine in August 2012. Dr. Strassberg testified that many events in Christine's life caused her anxiety, but the accident could not have caused her to suffer from PTSD because Christine could not remember anything about the accident. According to Strassberg, "PTSD is an anxiety disorder . . . specifically based around irrational fears reflective of recurrent memories of the event. If you can't remember the event, then you can't develop the irrational fears." Strassberg testified that his own experience as well as the pertinent literature showed that a person who has amnesia about an event cannot develop PTSD from that event.

Eric Drabkin, a forensic economist employed by the Reshkos to evaluate the Diamonds' economic losses resulting from the accident, offered damages calculations that were significantly lower than the plaintiffs' figures. For example, Drabkin identified five potential dates when Christine could have returned to work and used those dates to calculate a range of potential lost earnings of between $25,489.50 to $106,140.00.

### E. Closing Arguments

After the close of the evidence the Reshkos requested that the trial court preclude Yellow Cab from addressing the Diamonds' damages during closing arguments. They argued that Yellow Cab and the Diamonds had been in collusion throughout the trial and that permitting them to "team[]up" against the Reshkos on damages issues would be prejudicial and improper in light of the fact that Yellow Cab had already settled out of the case and no longer had a "horse in this race." Yellow Cab and the Diamonds opposed the Reshkos' request. Yellow Cab's trial counsel argued that his clients did not want to participate in the trial and "pay the freight," but that was a term of the settlement, and they now had the right to participate fully in the trial. The Yellow Cab attorney also argued that he was very experienced in valuing these types of cases, and that he was

11

"nobody's puppet." The Diamonds' trial counsel chastised the Reshkos for complaining that people were "ganging up" on them when they were the ones who had wrongfully refused to settle this case prior to trial. Pointing out that the Reshkos were offered the "same deal" as was offered to Yellow Cab, the Diamonds argued that the Reshkos' insurance carrier made the wrong decision by deciding to "roll the dice," and that "[e]verybody knew this was coming."

The trial court denied the Reshkos' request to restrict the scope of Yellow Cab's argument. The court observed that there was a good faith determination and no evidence of collusion had been presented at trial. Therefore, the court concluded that it had no legal basis for restricting the judgment of Yellow Cab's counsel regarding how he wanted to try this case.

During his closing argument, the Diamonds' trial counsel argued that Mansouri's U-turn may have been technically illegal but that it was reasonable under the circumstances, and that the only reason Mansouri was negligent was that he failed to take a second look behind him before completing the U-turn. Plaintiffs' counsel characterized the cab driver's mistake as understandable, pointing out that he did look earlier, before starting the slow U-turn, and at that point Reshko was far away. In other words, the Diamonds' counsel argued, Mansouri did not anticipate Reshko's "reckless speed." Plaintiffs' counsel then attempted to highlight evidence supporting his recommendations for each category of damage allegedly suffered by his clients which, when added together, were in the range of $1 million and $1.2 million for Christine, and around $200,000.00 for Andrew.

Yellow Cab's trial counsel argued that Mansouri was the "less culpable" party and that Reshko was the "bad guy here." Counsel acknowledged that Mansouri violated the law by making a U-turn from an outside lane, but he argued that the turn was not a substantial factor in causing the accident, and that his client used reasonable care under the circumstances. Thus, Yellow Cab's trial counsel urged the jury to apportion between 0 and 25 percent of the liability for the accident to his client. Next, Yellow Cab's attorney acknowledged that the Diamonds incurred significant medical bills and other

12

losses, and urged the jury to award all of their claimed past economic damages, which were approximately $294,000.00. Counsel stated that part of the future medical damages claim was speculative, but he admitted that, "unfortunately," Christine did have a different spine as a result of the accident, and he urged the jury to award $150,000.00 in future economic damages. He recommended $150,000.00 for past general damages, an additional $150,000.00 for future general damages, and $50,000.00 to $75,000.00 for loss of consortium. Thus, Yellow Cab argued that the evidence supported a total damages award of approximately $800,000.00.

The Reshkos' trial counsel argued that Mansouri was the primary cause of the accident, relying on the police report and highlighting problems with Mansouri's trial testimony. He also criticized the accident reconstruction analysis conducted by Yellow Cab's expert and spent time reviewing the damages evidence. Ultimately, the Reshkos counsel argued that the negligence of both drivers were substantial factors in causing the accident, the accident was a bad one, and the Diamonds were entitled to compensation for their injuries. According to the Reshkos, putting aside the speculative figures, the Diamonds' damages totaled approximately $302,900.71.

The Diamonds' first point on rebuttal was that Officer Lantrip had incomplete information which led him to the erroneous conclusion that Mansouri was primarily responsible for the accident. Plaintiffs' counsel then attempted to undermine Reshkos' contention that the damages claims were speculative. Finally, characterizing the Reshkos' damages calculations as "laughable," plaintiffs' counsel urged the jury to compare them to the recommendations of Mr. Bigley, trial counsel for Yellow Cab: "I mean, they are way under even what Mr. Bigley said. I mean, it just—and, you know, Mr. Bigley is no fool. He's not going to get up here and throw a big number up there if he doesn't have to. He's going to put the number up that he knows how to do this, he knows how to estimate, how to set up damages estimations in arguments like this. He's done it lots and lots of times."

### F. The Jury Verdict

The jury completed a special verdict form pursuant to which it found that Amir Mansouri and Serge Reshko were both negligent and substantial factors causing harm to Christine Diamond. They awarded economic damages in the amount of $258,778.00, and $137,000.00 in future economic damages. For noneconomic damages, the jury awarded $150,000.00 for past damages, $150,000.00 for future damages, and $50,000.00 for loss of consortium. Thus, the total damages award was $745,778.00. Finally, the jury found that Christine was not negligent, and apportioned responsibility for her harm 40 percent to Mansouri and 60 percent to Reshko.

On April 19, 2013, the trial court entered judgment against the Reshkos in the sum of $406,698.00,[5] together with costs and interest. In a motion for new trial, the Reshkos argued that Yellow Cab's participation as a party defendant deprived the Reshkos of a fair trial. The trial court issued a tentative ruling to deny the motion pursuant to previous rulings made during the trial. At a hearing on the motion, the Reshkos requested clarification regarding the court's reasoning. Denying the request for clarification and the motion itself, the trial court stated that it had already addressed the Reshkos' arguments during the trial.

A July 2013 amended judgment holds the Reshkos liable to the Diamonds for $406,698.00, together with costs and fees totaling $31,698.48, plus interest.

---

[5] The $406,698.00 figure represents the sum of (1) $210,000.00, which is 60 percent of $350,000.00, the total award of noneconomic damages; and (2) $196,698.00, which is the balance of the total economic damages award after deducting a credit for the portion of the Yellow Cab settlement that was paid to compensate the Diamonds for economic damages. To determine what portion of the $350,000.00 Yellow Cab settlement was attributable to the Diamonds' economic damages, the court applied the following formula: First, it determined that the total economic damages award constituted 56.88 percent of the total damages award. Second, it determined that 56.88 percent of the Yellow Cab settlement constituted $199,080.00. Third, it deducted $199,080.00 from the total economic damages award of $395,778.00, which left a balance of $196,698.00. No challenge to these calculations is made on appeal.

14

## DISCUSSION

### A. Standard of Review

"A trial court's ruling on the admissibility of evidence is generally reviewed for abuse of discretion. [Citations.]" (*Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1476; see also *Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, 885 ["[w]e review a trial court's decision to admit or exclude evidence under the abuse of discretion standard"]; *Caira v. Offner* (2005) 126 Cal.App.4th 12, 31-32 [order excluding evidence of a settlement agreement pursuant to Evid. Code, § 1152 reviewed for an abuse of discretion].)

The Diamonds contend this deferential standard applies here, characterizing the trial court rulings which prevented the jury from knowing about the Yellow Cab settlement as "garden-variety" evidentiary rulings. In a separate respondents' brief in support of the judgment,[6] Yellow Cab agrees with the Diamonds that the standard of review is abuse of discretion, and goes so far as to argue that admitting this evidence would have been an abuse of discretion because it would have unfairly prejudiced the Diamonds by conveying a message to the jury that Yellow Cab was responsible for the accident.

On the other hand, the Reshkos contend that, under the circumstances presented, the trial court's rulings are subject to de novo review because excluding evidence of the Diamonds' pretrial settlement agreement with Yellow Cab deprived the Reshkos of a fundamental right to a fair trial. They argue the jury could not properly assess witness

---

[6] "Anyone who was a party below, whose interest is adverse to or would be affected by reversal or modification of the appealed judgment, may file a respondent's brief, even if not named in the judgment. [Citations.]" (Eisenberg et al., Cal. Practice Guide, Civil Appeals and Writs (The Rutter Group 2014), ¶ 9:195, p. 9-55.) Yellow Cab has an interest in this litigation resulting from its contractual obligation under the settlement agreement to participate in the Diamonds' trial. (*Everman v. Superior Court* (1992) 8 Cal.App.4th 466, 472 (*Everman*).) That interest would be adversely affected by a reversal of the judgment.

credibility, perceive trial tactics or evaluate trial arguments without knowledge of the fact that Yellow Cab switched sides before trial. In order to properly do its job, the Reshkos argue, the jury needed to know that Yellow Cab no longer had any "skin in the game."

The heightened standard of review that the Reshkos seek is not supported by the case authority upon which they rely, *People v. Waidla* (2000) 22 Cal.4th 690, 741 (*Waidla*). One issue in that appeal from a death penalty judgment was whether the trial court erred by excluding the appellant from participating in some of the trial proceedings. Recognizing that a criminal defendant has a constitutional right to be present at his own trial, the Supreme Court applied a de novo standard of review to that trial court order. (*Id*. at p. 741.) However, when reviewing evidentiary rulings from the same trial, the Supreme Court applied an abuse of discretion standard of review. (*Id*. at pp. 718, 723.) Thus, *Waidla* confirms that our standard of review in this case is abuse of discretion.

**B. Analysis**

The Diamonds and Yellow Cab contend this case is governed by Evidence Code section 1152, which provides in relevant part: "Evidence that a person has, in compromise . . . , furnished or offered or promised to furnish money or any other thing . . . to another who has sustained . . . loss or damage . . . is inadmissible to prove his or her liability for the loss or damage or any part of it." This statute codifies the rule that evidence of a settlement agreement between a plaintiff and one or more joint tortfeasors is not admissible to prove the liability of the settling tortfeasor. (*Granville v. Parsons* (1968) 259 Cal.App.2d 298, 303; see *Brown v. Pacific E.R. Co.* (1947) 79 Cal.App.2d 613, 619; *Albrecht v. Broughton* (1970) 6 Cal.App.3d 173, 178.) This rule does not resolve the present appeal because the Reshkos did not seek to offer evidence of the settlement agreement as proof of Yellow Cab's liability.

As the Reshkos argued in the trial court, evidence of a plaintiff's settlement with one or more defendants is admissible at trial to prove witness bias and to prevent collusion. (*Granville v. Parsons*, *supra*, 259 Cal.App.2d at pp. 303-304; *Shepherd v. Walley* (1972) 28 Cal.App.3d 1079, 1083; see also 1-200 CACI No. 217 [instructing jury that evidence of a settlement may not be considered "to determine responsibility for any

16

harm," but may only be considered to decide whether witness who has settled is "biased or prejudiced" or whether his testimony is "believable"]; 2-5000 CACI No. 5003 [in deciding whether to believe a witness's testimony, the jury may consider whether he showed "any bias or prejudice" or if he has "a personal relationship with any of the parties involved in the case" or "a personal stake in how the case is decided"].)

In fact, when a defendant is a party to a sliding scale settlement, which is also called a "Mary Carter" agreement, that agreement must be disclosed to the jury if the settling defendant testifies at trial, unless the court finds that the disclosure will create a substantial danger of undue prejudice. (Code Civ. Proc., § 877.5, subd. (a)(2); *Alcala Co. v. Superior Court* (1996) 49 Cal.App.4th 1308, 1316 (*Alcala*); see also *Moreno v. Sayre* (1984) 162 Cal.App.3d 116, 125.)[7]

The Diamond/Yellow Cab settlement was not a sliding scale agreement, although the specific term of the settlement which is at issue in this appeal also appears in the standard sliding scale agreement—that is, the term requiring the settling defendants to participate as parties at the plaintiffs' jury trial. In this context, the justification for allowing a settling defendant to participate at trial is to prevent the nonsettling defendants from making an "empty chair" argument by ascribing "fault to an actor who is not present to defend himself." (*Everman*, *supra*, 8 Cal.App.4th at p. 470.)

Pertinent authority establishes that a term in a settlement agreement requiring the settling defendant to stay in the case during trial is not per se improper, but the settling defendant's position should be revealed to the court and jury to avoid committing a fraud on the court, and to permit the trier of fact to properly weigh the settling defendant's testimony. (*Pellett v. Sonotone Corp.* (1945) 26 Cal.2d 705, 713 (*Pellett*); *Everman*, *supra*, 8 Cal.App.4th at p. 473.)

---

[7] "The typical 'Mary Carter' agreement is secret, calls for the settling defendant to participate in the trial on the plaintiff's behalf, and provides for a settling defendant to be credited for amounts the plaintiff recovers from nonsettling defendants. [Citation.] Its collusive nature and potential for fraud have been well documented and recognized. [Citation.] The interests of the parties are clearly realigned in a manner not apparent to the trier of fact." (*Alcala*, *supra*, 49 Cal.App.4th at p. 1316.)

17

*Pellett*, *supra*, 26 Cal.2d 705, was an appeal from a judgment of nonsuit in favor of several defendants in a personal injury action arising out of the negligent manufacture of a hearing aid. The issue before the court was whether the plaintiff's pretrial settlement with one defendant constituted a release which, under the law at that time, would have constituted a release of all joint tortfeasors. (*Id*. at p. 710.) Although that issue is not relevant here, the *Pellett* court also withheld its approval of a provision in the settlement which required the settling defendant to appear as a party at trial and to defend the lawsuit without disclosing the settlement to the court or parties. As the court explained, "While the trial court did not find, and we cannot hold as a matter of law, that there was any fraud or collusion in this case, such an agreement might lead to a fraud upon the court by concealing the position of a party who is an important witness in the action." (*Id*. at p. 713.) Ultimately, the *Pellett* court elected not to decide whether the settlement term was invalid because: (1) the parties had not raised the issue on appeal; and (2) the record established that, notwithstanding the requirement of secrecy, the agreement had been disclosed. Therefore, "the court or jury could weigh the testimony of [the settling defendant] in the light of the knowledge that, since the agreement provided that judgment could not be enforced against him, he was not a witness who was adverse to the plaintiff." (*Ibid*.)

In *Everman*, *supra*, 8 Cal.App.4th 468, the plaintiff was seriously injured when a postal service jeep he was driving was struck by a pickup truck. The pickup truck driver claimed he was distracted by an oncoming trash truck that crossed over the center line a short distance ahead of where the accident occurred while attempting to make a right turn. Plaintiff sued the pickup truck driver and his employer, the trash truck driver and his employer, and the city for designing and maintaining a dangerous road. (*Id*. at p. 469.) Prior to trial, the plaintiff entered into a proposed settlement with the pickup truck driver defendants, which was conditioned on securing a good faith determination. (*Id*. at p. 470.) The trial court denied a motion for a good faith determination, finding that a term in the agreement requiring the pickup truck driver to participate and be represented at trial was collusive " 'in the sense that it is not above board when you have

18

a person who is insulated from further liability, who is fully settled, sitting in a case, in a sense taking a position on behalf of the plaintiff.' " (*Ibid.*)

The *Everman* court reviewed the trial court order pursuant to a petition for writ of mandate. (*Everman*, *supra*, 8 Cal.App.4th at p. 469.) The nonsettling defendants argued the settlement was inherently collusive and deceitful because the jury would likely not be advised about the agreement, and thus would not know the truck driver defendant's "true status as a defendant facing no monetary liability." (*Id.* at p. 471.)

Applying *Pellett*, the *Everman* court concluded that a settlement agreement which is "otherwise within the good faith 'ball park' . . . is not subject to disapproval solely because it provides for continuing participation in the trial of the lawsuit by a settling defendant" but, "[a]s a general rule, the possible bias of such a participating defendant should be disclosed to the jury" in order to avoid committing a fraud on the court. (*Everman*, *supra*, 8 Cal.App.4th. at p. 473.) In the case before the *Everman* court, the settling defendants had already agreed to disclose the agreement and therefore, the trial court abused its discretion by denying the motion for good faith settlement solely because the agreement contained a term requiring the settling defendant to continue to participate in the trial. (*Ibid.*)

*Pellett* and *Everman* establish that an agreement requiring a settling defendant to participate as a party and/or witness at a subsequent jury trial is presumptively admissible evidence at that trial. Without this evidence, the jury is prevented from fully assessing the motivations of both the plaintiff and the settling defendant, and from properly weighing the credibility of their witnesses. (*Pellett*, *supra*, 26 Cal.2d at p. 713; *Everman*, *supra*, 8 Cal.App.4th at pp. 471-473; see also *Bobrow/Thomas & Associates v. Superior Court* (1996) 50 Cal.App.4th 1654, 1663, fn. 5 [recognizing that a trial court may introduce evidence of settlement agreement to help explain why the plaintiff no longer blames the settling defendant for its injury]; *Zelayeta v. Pacific Greyhound Lines, Inc.* (1951) 104 Cal.App.2d 716, 729 [evidence that trial witnesses settled their own claims against defendant was admissible to show bias].)

19

Neither set of respondents provides this court with a substantive response to *Pellett* or *Everman*. Instead, Yellow Cab contends that *Pellett* is not good law because it was overruled by *Leung v. Verdugo Hills Hospital* (2012) 55 Cal.4th 291, 302, footnote 1 (*Leung*). In *Leung*, the Supreme Court disapproved the "common law release rule," and partially overruled prior decisions, including *Pellett*, to the extent they applied that rule. (*Ibid.*) The part of *Pellett* upon which we rely has nothing to do with the common law release rule and remains good law. For their part, the Diamonds contend that even if evidence of the settlement agreement was potentially admissible, the Reshkos cannot establish that the trial court abused its discretion because the record shows that the court "assessed and reassessed its decision not to inform the jury of the settlement *three times*." (Original italics.)

"While trial judges ordinarily enjoy broad discretion with respect to the admission and exclusion of evidence in ruling on motions in limine [citation], a court's discretion is limited by the legal principles applicable to the case. [Citation.] ' "The scope of discretion always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action . . . .' Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion." ' [Citations.]" (*Katiuzhinsky v. Perry* (2007) 152 Cal.App.4th 1288, 1294.)

In the present case, although the trial court refused to inform the jury about the settlement agreement at least three times, the record does convey precisely why the court made these rulings. As best as we can determine from this unclear record, the court concluded that the good faith settlement determination precluded it from admitting evidence of the settlement unless some other evidence of bias or collusion was uncovered during the trial. This ruling transgressed the confines of the applicable legal principles in at least three ways.

First, the good faith settlement determination did not limit the trial court's authority to admit evidence of that settlement at trial. To the contrary, as the superior court judge who made the good faith settlement determination in this case recognized, the

20

decision whether to admit evidence of the settlement was for the trial court to make. (*Alcala*, *supra*, 49 Cal.App.4th at pp. 1317-1319.) *Alcala* was a mandate proceeding challenging a good faith determination of a sliding scale settlement agreement. The *Alcala* court not only denied the writ, it also denied a request to direct the lower court to amend its order containing the good faith determination to explicitly require the disclosure of the settlement agreement and all of its terms at the trial because, as the appellate court explained, "[t]hat is a matter for the trial court to decide through in limine motions and evidentiary rulings." (*Id*. at p. 1318, fn. 7, italics omitted.)

Second, a good faith determination of a settlement agreement which contains a term requiring continued participation by a settling defendant is premised on a presumption that the jury will be made aware of the settlement in some way. As discussed above, the very reason a term in a settlement agreement which requires ongoing participation by the settling defendant is not per se collusive is because evidence of that settlement can and should be disclosed to the jury at trial. (*Everman*, *supra*, 8 Cal.App.4th at p. 468.)[8]

*Alcala*, *supra*, 49 Cal.App.4th 1308 makes this same point in the context of a review of a sliding scale agreement. The nonsettling defendants in that case argued that a term in the agreement requiring the continued participation of the settling defendants was collusive because of the unique way the parties had structured the settlement and calculated the settling defendants' liability. Rejecting this contention, the *Alcala* court reasoned that although the settlement created a "complicated" relationship among the various parties, it was not beyond the jury's understanding and "[w]ith proper disclosure

---

[8] " ' "Collusion has been variously defined as (1) 'a deceitful agreement or compact between two or more persons, for the one party to bring an action against the other for some evil purpose, as to defraud a third party of his right'; (2) 'a secret arrangement between two or more persons, whose interests are apparently conflicting, to make use of the forms and proceedings of law in order to defraud a third person, or to obtain that which justice would not give them, by deceiving a court or its officers'; and (3) 'a secret combination, conspiracy, or concert of action between two or more persons for fraudulent or deceitful purposes.' [Citation.]" [Citation.]' [Citation.]" (*Andrade v. Jennings* (1997) 54 Cal.App.4th 307, 327.)

by the court of the terms of the settlement agreement and the relationship of the parties, the jury may be made aware of the realignment of the interests of the parties and the potential bias on the part of the settling defendants and their witnesses." (*Id*. at p. 1317.)

Third, the trial court appears to have based its rulings on the Diamonds' and Yellow Cab's shared misperception about the relevance of settlement agreement evidence when a settling defendant appears and fully participates at trial. This evidence is not relevant simply to explain a bias that has otherwise been brought to the attention of the jury. Rather, the evidence is independently relevant because disclosing the realignment of the interests of all of the parties who appear at trial prevents collusion, and assists the jury in making reasoned determinations regarding liability and damages by facilitating informed evaluations of trial tactics, the credibility of the parties and their respective counsel, and, ultimately, the substantive trial evidence.

Therefore, we conclude it was an abuse of discretion for the trial court to exclude evidence of the Diamond/Yellow Cab settlement, including the clause that required Yellow Cab to attend and participate in the trial. In answer to Yellow Cab's assertion that the Diamonds would have been prejudiced by the admission of settlement evidence, nothing in this record suggests any reason why this concern could not have been deftly avoided through the use of a limiting instruction. (See *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.*(2000) 78 Cal.App.4th 847, 915; 1-200 CACI No. 217 [Evidence of Settlement]; 2-5000 CACI No. 5003 [Witnesses].)

Furthermore, the trial court's initial erroneous assessment of the settlement evidence led to two subsequent and additional errors. After waiting to see how the proceedings would unfold, the trial court overlooked later presented evidence of witness bias. During his deposition, Mansouri testified that he did not remember whether Christine had her seat belt on, but at trial he testified that he looked in his rearview mirror before pulling away from the curb and saw that Christine was wearing her seatbelt. While the testimonial discrepancy itself was revealed, the jury was deprived of evidence which could have supported a conclusion that Mansouri was biased in favor of the plaintiffs now that he had settled his case with the Diamonds. Indeed, when the matter of

the settlement's admissibility was argued to the court at the start of the trial, counsel for the Diamonds essentially conceded the fact of the settlement with Yellow Cab would be relevant in the event Mansouri's trial testimony materially departed from his earlier deposition testimony.

Finally, by the time Yellow Cab presented closing argument on the damages issue its bias in favor of the Diamonds and against the Reshkos was indisputable. Yellow Cab helped the Diamonds make their case against the Reshkos by characterizing Serge Reshko as "the bad guy." It went further by disavowing explicitly the contributory negligence defense, even temporally allying its own liability expert witness with the Diamonds' during the latters' case-in-chief. Yellow Cab's counsel then conceded during his closing argument virtually all of the Diamonds' claimed damages, and proposed an evaluation of those damages that the Diamonds subsequently approved while vouching for the credibility of Yellow Cab's attorney.

Yellow Cab contends that their litigation strategy and damages evaluation had always conflicted with the Reshkos' approach, and they insist that they had a legal right to present their version of this case to the jury. This contention is unsupported by a citation to authority and ultimately is beside the point. The bias inherent in a settling defendant's realignment with the plaintiff's interest may or may not affect the conduct of the plaintiff or settling defendant at trial, but that is a question for the jury to decide. Because the settlement agreement was kept secret, the jury in this case was deprived of its right to determine whether Yellow Cab's evidence, arguments, and concessions were substantively genuine, or whether that its presentation was biased and it had tactically joined forces with the Diamonds for reasons unrelated to the merits of the Diamonds' case.

## C. Prejudice

The Reshkos argue that the erroneous trial court rulings amounted to a "structural error," requiring per se reversal of the judgment. Structural errors are " 'structural defect[s] in the constitution of the trial mechanism . . . affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.' " (*In re*

23

*Angela C.* (2002) 99 Cal.App.4th 389, 394.) "A structural error requires reversal without regard to the strength of the evidence or other circumstances. [Citation.] [¶] The United States Supreme Court has found structural errors, however, only in a very limited class of cases: the total deprivation of the right to counsel at trial [citation], a biased judge [citation], unlawful exclusion of members of the defendant's race from a grand jury [citation], denial of the right to self-representation at trial [citation], denial of the right to a public trial [citation], and erroneous reasonable-doubt instruction to jury [citation]. [Citation.]" (*Id*. at pp. 394-395.) In other words, a structural error is one that, by its very nature "implicates the fundamental fairness of judicial proceedings." (*Id.* at p. 395.)

Excluding evidence of the Diamond/Yellow Cab settlement in a civil trial was not structural error. Instead, a "trial court's error in excluding evidence is grounds for reversing a judgment only if the party appealing demonstrates a 'miscarriage of justice'— that is, that a different result would have been probable if the error had not occurred. [Citations.]" (*Zhou v. Unisource Worldwide*, *supra*, 157 Cal.App.4th at p. 1480.) " ' "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' [Citation.]" (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069.)

On appeal, both sets of respondents contend that the Reshkos cannot meet this high standard of prejudice. The Diamonds argue "there is no evidence in the record that the evidence that came in at trial would have been any different if the trial court judge had told the jury about the settlement." The flaw in this theory is that the settlement agreement itself is the material evidence that was improperly excluded from this trial. Yellow Cab argues there is nothing in the trial record to indicate that the fact of the settlement actually impacted any witness testimony. First, as discussed above, Mansouri's testimony about whether Christine wore her seatbelt strongly suggests that the settlement agreement directly impacted his testimony. Second, in assessing prejudice, the question is not simply whether the settlement affected the witness testimony but more

24

fundamentally whether knowledge of the settlement agreement would have affected the jury's assessment of the conflicting evidence that was actually produced at this trial.

Because it was prevented from learning that the Diamonds had already settled their case against Yellow Cab, the jury was denied the opportunity to consider the effect of that settlement on the trial strategies the parties employed in their respective efforts to influence the jury's resolution of the material conflicts in the trial evidence. Many of those conflicts, which we highlighted in our factual summary of this case, bore directly on the jury's most difficult tasks of determining the primary cause of the accident and the extent of Christine's damages. In our opinion, it is reasonably probable that the jury's resolution of conflicting evidence pertaining to at least some of the material disputed issues would have been more favorable to the Reshkos if the jury had been made aware of the fact that the Diamonds settled their case against Yellow Cab prior to trial.

Indeed, this case serves as a virtual textbook illustration as to why *Pellett* and *Everman* hold that evidence of a pretrial settlement between the plaintiff and one or more defendants who participate fully in the ultimate trial is relevant and ordinarily should be disclosed to the jury. (*Pellett*, *supra*, 26 Cal.2d at p. 713; *Everman*, *supra*, 8 Cal.App.4th at pp. 471-473.) Without that evidence, the jury was prevented from fully assessing the credibility of the witnesses called by the Diamonds and Yellow Cab, and from evaluating the tactical motivations underlying the presentations and arguments that the Diamonds and Yellow Cab advanced at trial. On this record, the errors could well have affected the outcome of the trial. Therefore, not only was it an abuse of discretion to exclude evidence of the Diamond/Yellow Cab settlement, but it was prejudicial to the Reshkos, requiring a reversal of the judgment entered following the jury's verdict.

## IV.

## DISPOSITION

The judgment is reversed. Costs on appeal are awarded to the Reshkos against all respondents.

25

                               _____

                               RUVOLO, P. J.

We concur:

_____

REARDON, J.

_____

STREETER, J.

A139251, *Diamond v. Reshko*

| | |
|---|---|
| Trial Court: | San Francisco Superior Court |
| Trial Judge: | Hon. Peter J. Busch |
| Counsel for Appellants: | Law Office of Michael F. Brown and Michael F. Brown |
| | Sedgwick LLP, Christina J. Imre, Douglas J. Collodel, Michael M. Walsh |
| Counsel for Respondents Amir Mansouri and Antonin Mastalir: | Gilbert, Kelly, Crowley & Jennett LLP, Timothy W. Kenna, Paul A. Bigley, Rebecca J. Smith |
| Counsel for Respondents Christine Diamond and Andrew Diamond: | Bartko, Zankel, Bunzel & Miller, Stephen T. Cox, Simon R. Goodfellow |

A139251, *Diamond v. Reshko*